UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
───────────────────────────────────────────────
DONNA L. MCGULLAM,

                Plaintiff,                **MEMORANDUM AND ORDER**
                                                        04-CV-2891 (DRH) (AKT)
    -v.-

CEDAR GRAPHICS, INC.,

                Defendant.
───────────────────────────────────────────────

**APPEARANCES:**

**For the Plaintiff:**
**Donna L. McGullam, Pro Se**
392 Main Street
Eastport, New York 11941

**For the Defendant:**
**Jackson Lewis LLP**
58 South Service Road, Suite 410
Melville, New York 11747
By: Mark S. Mancher, Esq.
     Ana C. Shields, Esq.

**HURLEY, Senior District Judge:**

        Plaintiff Donna L. McGullam ("Plaintiff") filed the present action against defendant Cedar Graphics, Inc. ("Defendant") alleging that she was discriminated against on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"). Defendant moves for summary judgment under Federal Rule of Civil Procedure ("Rule") 56. Plaintiff has not filed any opposition papers. For the reasons stated below, Defendant's motion is granted.[1]

---

[1] Defendant complied with Local Civil Rule 56.2 by providing the requisite "Notice to Pro Se Litigant." After not receiving any opposition papers from Plaintiff, Defendant sent Plaintiff a letter advising her that her Complaint may be dismissed without a trial if she fails to

## BACKGROUND

The following facts, which are supported by the record, will be deemed admitted.

Defendant is a full-service printing company. Michael Clark ("Clark") is the President. In April 1996, Plaintiff was hired by Defendant as a Production Assistant. She later became a Customer Service Representative within Defendant's Production Department. The vast majority of Plaintiff's claims arise out of her employment in the Production Department, during which time Plaintiff claims she was subjected to a hostile work environment.

In September 1999, Plaintiff requested and received a transfer to Defendant's Estimating Department. At her deposition, Plaintiff testified that she transferred because the new position "offered new growth within the company" (Affirmation of Mark S. Mancher, dated Nov. 9, 2007, Ex. 3 ("Pl.'s Dep.") at 156), and she would be "learning a new skill." (*Id.* at 101.) She further testified that she did not express to Clark or anyone else that she was requesting a transfer in order to remove herself from an allegedly hostile work environment. (*Id.* at 110-11.) Because Plaintiff had no experience working as an Estimator, her salary was reduced from $1200 per week to $1050 per week.

At her deposition, Plaintiff admitted that after the transfer, the environment was "better" in that she was "not exposed to that which went on in the production department on a daily basis." (*Id.* at 127.) Her journal entries[2] confirm this as Plaintiff noted that "[w]hile

---

respond to Defendant's motion. To date, Plaintiff has not responded.

[2] Plaintiff produced a 61-page journal in discovery allegedly detailing the incidents forming the basis of her claims. At her deposition, Plaintiff testified that the journal represents an exhaustive summary of all of the incidents which occurred while she worked for Defendant. (Pl.'s Dep. at 64-65.) For purposes of this motion only, Defendant "accepts its contents as factual and setting forth the universe of allegedly discriminatory acts against her and the alleged

working in the estimating department I was away from the majority of the harassment, hostility and aggravation." (Affirmation of Mark S. Mancher, dated Nov. 9, 2007, Ex. 7 ("Journal") at 22.) There is only one incident reflected in Plaintiff's deposition, as well as her journal, after the transfer. She testified that after the transfer, she had to interact with production personnel on a regular frequency and that there was "a salesman [on the other side of the cubicles] who was quite vocal about very derogatory things about women." (Pl.'s Dep. at 128.) Similarly, her journal reflects the following:

> On the opposite side of my cubic[le] wall was a salesman [who] carried on numerous lengthy conversations with male buddies and made frequent comments about women such as referring to them as "chickies". He also remarked that "[i]f it wasn't going to be a sleep-over, she wasn't worth the trip", regarding a woman friend that he was involved with . . . . This was a thoroughly demeaning comment regarding women.

(Journal at 22.)

On April 10, 2000, Defendant laid off a male Estimator in Plaintiff's department. In April 2000, Plaintiff's journal reflects that she "was concerned as to the stability of the company." (Pl.'s Journal at 3.) That month, Plaintiff spoke to Clark about her concerns and inquired as to whether the layoffs would affect the department she was working in and whether they would affect her personally. (Pl.'s Dep. at 141.) According to Plaintiff's deposition testimony, Clark told her that the layoffs would not impact Plaintiff's position. (*Id.* at 143.) Nevertheless, on September 12, 2000, Plaintiff was laid off. Before leaving the building,

---

protected activity engaged in." (Def.'s Local Rule 56.1 Stmt. at 4-5 n.4.)

Plaintiff met with Clark, at which time she asked Clark why she was being laid off.[3] Clark explained that the reason for the layoff was strictly economic. Plaintiff never mentioned sex discrimination, sex harassment or retaliation during her conversation with Clark. Instead, she raised her seniority and productivity relative to other Estimators.

In addition to the lay off of two Estimators (Plaintiff in September 2000 and one male Estimator in April 2000), an additional two Estimators from the same department were laid off in 2001, both female. Ultimately, by mid-2001, Defendant employed only one Estimator, Peter Kremler. Mr. Kremler was hired on December 1, 1995, before Plaintiff was hired on April 15, 1996. Mr. Kremler was later replaced by Karl Riemenschneider, who is the only Estimator employed by Defendant today.

On July 3, 2001, Plaintiff filed a complaint with the New York State Division of Human Rights (the "NYSDHR") and the Equal Employment Opportunity Commission (the "EEOC") charging Defendant with unlawful discrimination. After an investigation, the NYSDHR issued a finding of no probable cause on February 9, 2004, and dismissed her complaint. Thereafter, on April 2, 2004, the EEOC adopted the findings of the NYSDHR, dismissed the complaint, and issued a right-to-sue letter. Plaintiff initiated the instant lawsuit on July 6, 2004.

Plaintiff's pro se Complaint alleges as follows:

While working for the defendant, I, a female employee, was
regularly exposed to sexual comments, sexually explicit materials,
sexual jokes, hostile [and] vulgar language, sexual in[n]uendos and

---

[3] Clark secretly recorded his conversation with Plaintiff. A transcript of the tape recording was prepared and was used as an exhibit at Plaintiff's deposition, at which time Plaintiff admitted that the transcript accurately reflected her conversation with Clark that day.

> gross behavior, primarily by male coworkers, including management. Continual complaints to management were fruitless. I transferred to an alternate dept in the Fall of [19]99, to be further away from the bulk of the problem, though it didn't end completely. [T]his was at the expense of a substantial pay cut. Less than one year later, I was terminated. I believe I was chosen because I had complained in the past. I was told there were financial setbacks, but two days later, a male worker was replacing me in my duties – he was a rehire.

(Compl. ¶ 8.) The Complaint asserts claims based upon her termination, "[u]nequal terms and conditions of . . . employment," and a "sexually hostile environment." (Compl. ¶ 4.) Although Plaintiff alleges that her claims are brought pursuant to Title VII, the Court construes Plaintiff's Complaint as asserting claims pursuant to the New York Human Rights Law ("NYSHRL") as well.

## DISCUSSION

### I. *Applicable Law and Legal Standards*

#### A. *Unopposed Motion for Summary Judgment*

The Second Circuit, in the seminal case of *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004), addressed the proper analysis that districts courts should employ when presented with an unopposed motion for summary judgment. The court held that "Fed. R. Civ. P. 56, governing summary judgment motions, does not embrace default judgment principles." *Id.* at 242. Thus, "[e]ven when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Id.* In addition, "[a]lthough the failure to respond may allow the district court to accept the movant's factual assertions as true, *see* Local Civ. R. 56.2," *id.* at 246, the district court "must be satisfied that the citation to evidence in the record supports the

assertion." *Id.* at 244.

B.  ***Summary Judgment Standard***

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the

allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind

7

would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## II. Defendant's Motion For Summary Judgment is Granted

### A. *Plaintiff's Claims of Hostile Work Environment Based Upon Sexual Harassment are Dismissed*

#### 1. *Governing Legal Principles*

To establish a hostile work environment claim, a plaintiff must prove "[1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.*

"This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* at 374 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In analyzing a plaintiff's case, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency,

8

and degree of the abuse." *Id.* (citing *Harris*, 510 U.S. at 23). Relevant factors include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23).

"Finally, it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Id.* (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)); *see also Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class. In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes.").[4]

### 2. Plaintiff's Hostile Work Environment Claims are Time-Barred Under Title VII

In order to file an action in federal court alleging discrimination under Title VII, a plaintiff must first file a charge with the EEOC within 300 days after the allegedly discriminatory act occurred. *See* 42 U.S.C. § 2000e-5(e); *see also Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 76 (2d Cir. 2003). "'This statutory requirement is analogous to a statute of limitations.'" *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). The statute of

---

[4] Hostile environment/sexual harassment claims are governed by the same standards under Title VII and the NYSHRL. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998).

9

limitations begins to run when each "discrete discriminatory act[]" occurs. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Hostile environment claims, however, "are different in kind from discrete acts" as "[t]heir very nature involves repeated conduct." *Id.* at 115. Because the unlawful employment practice cannot be said to occur on any one particular day, *id.*, "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*

Here, Plaintiff filed her administrative complaint with the NYSDHR and the EEOC on July 3, 2001. Thus, in order to satisfy the 300-day limitations period, Plaintiff must allege an act that was part of the alleged hostile work environment which occurred within 300 days prior to Plaintiff's filing of her administrative complaint, viz. September 6, 2000. *See* 42 U.S.C. § 2000e-5(e)(1).

The only evidence in the record supporting Plaintiff's claims is found in Plaintiff's deposition testimony and her journal. Both reveal that virtually all of the alleged discriminatory and hostile acts occurred prior to September 1999, when Plaintiff was transferred to the Estimating Department. After her transfer, Plaintiff admitted that her work environment improved and that she was away from the majority of harassment. In fact, in both her deposition as well as her journal, Plaintiff complained of only a single incident after her transfer. She claimed she overheard a male colleague, during his discussions with male friends, make

10

comments during which he referred to women as "chickies" and allegedly stated "if it wasn't going to be a sleep-over, she wasn't worth the trip." (Journal at 22; *see also* Pl.'s Dep. at 128.) This single remark, which was not directed at Plaintiff, cannot meet the severe and persuasive standard of sexually hostile work environment set forth above. Thus, because there is no evidence of any acts that were part of a hostile work environment which occurred within 300 days of Plaintiff's administrative complaint, Plaintiff's claims for hostile work environment under Title VII are dismissed as time-barred. Even assuming these claims were not time-barred, however, and the Court could consider all of the evidence in the record regardless of date, Plaintiff's claims of hostile work environment would still fail for the reasons discussed immediately below.

        **3.**     *Plaintiff Fails to Raise a Genuine Issue of Material Fact as To her Hostile Work Environment Claims Under Both Title VII and the NYSHRL*

After reviewing Plaintiff's deposition testimony and journal for evidence relevant to her claim of a sex-based hostile work environment, the Court concludes that the incidents outlined therein do not rise to the level of conduct that is "'severe or pervasive enough to create an objectively hostile or abusive work environment.'" *Alfano*, 294 F.3d at 374 (quoting *Harris*, 510 U.S. at 21)). For example, Plaintiff complains that on her first day of employment, she was asked to retrieve a file from archives which was accessible only by ladder. She was asked to climb the ladder while a male co-worker held it steady at its base, despite the fact that she was wearing a dress. Her co-worker told her "not to worry, that he wasn't going to look up [her] skirt." (Journal at 11.) Plaintiff immediately complained to her manager and was never required to retrieve files again.

11

Plaintiff further claims that during her first week of employment, the employee training her "failed greatly in making [her] fe[e]l a welcome part of the company" (*id.*), that she was not given a chair to sit in on her "entire first day" (*id.*), that she was asked to complete a quality check on sexually explicit greeting cards (*id.*) but once she complained to management about it, she was never asked to work on that account again (Clark Aff., dated Nov. 7, 2007, ¶¶ 14-17), during her first week of employment, an employee snapped his fingers at her in an attempt to get her attention, calling "Hey you, what's your name, lady, you . . . ." (Journal at 11), after complaining about two employee smoking (one male, one female), Plaintiff "was seen as the enemy" (*id.* at 12), during her first year of employment, Clark instituted a "4 o'clock day," permitting certain employees to leave the office early so they could attend their children's soccer games; Plaintiff allegedly complained that the benefit did not extend to her because she was single; thereafter, Plaintiff was permitted to enjoy the "4 o'clock day" just like everyone else, (*id.* at 9), jokes were made by employees about a man who "hadn't gotten laid in a long time" and about a woman who was nice "except when she's on the rag" (*id.* at 12), a male employee was "constantly witnessed openly scratching and adjusting his genitals" (*id.*) which became a "known practice" that other employees "laughed about openly" and was "not something he did that was directed toward [Plaintiff] as a woman" (Pl.'s Dep. at 67), a male employee made sexually explicit "Rodney Dangerfield" jokes in earshot of all (*id.* at 72; *see also* Journal at 13), this same employee was "very 'touchy'" and would "pat [Plaintiff] on the arm and shoulder when he spoke to [her]" (*id.* at 14), there were constant jokes about a homosexual employee (*id.*), employees, primarily male, used excessive foul language (*id.* at 15), a sign Plaintiff had taped to her computer which read "A lot goes into being the best" was changed to read "A lot

12

goes into being the bitch" though Plaintiff does not know who changed it (*id.*), and a note was left on the radio stating "do not touch the radio" because Plaintiff had complained of the radio being too loud (*id.* at 16).

Drawing all inferences in Plaintiff's favor, although the conduct of which Plaintiff complains may have been offensive, no rational juror could find that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [Plaintiff's] employment were thereby altered." *See id.* at 373. To the contrary, Plaintiff's proffer demonstrates off-hand remarks that are better characterized as "mere offensive utterance[s]" rather than "physically threatening or humiliating" conduct. *Harris*, 510 U.S. at 23. While some of the employees' jokes may have made Plaintiff uncomfortable, they were not personally insulting, nor were they obviously intended to intimidate, ridicule, or demean Plaintiff on account of her gender. *See id.* at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview."). In fact, in numerous cases in which allegations of hostile work environment were far more severe and numerous than those alleged here, claims have been dismissed for insufficiency of evidence for failure to demonstrate pervasive discrimination. *See Alfano*, 294 F.3d at 379 (collecting cases). Accordingly, the Court finds that Plaintiff has failed to raise a genuine issue of material fact that Defendant's conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment." *See Harris*, 510 U.S. at 21.

Moreover, there is nothing in the record to indicate that the alleged conduct was made on the basis of gender. *See Alfano*, 294 F.2d at 374. At best, the evidence here

13

demonstrates that the work environment was equally unprofessional for both men and women. *Cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]. . . because of . . . sex.' . . . . 'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'") (quoting 42 U.S.C. § 2000e-2(a)(1) and *Harris*, 510 U.S. at 25). In fact, the majority of allegedly sexually hostile behavior consists of isolated comments made by both men and women during their general conversations in the workplace. The few that were directed toward Plaintiff were not gender-based. Accordingly, for this independent reason, Plaintiff's claim must be dismissed.

In sum, the Court finds that the alleged conduct in this case falls far short of an actionable claim. Accordingly, Plaintiff's claims for sexual harassment based on an alleged hostile work environment are dismissed.

### B. *Plaintiff's Title VII and NYSHRL Claims of Disparate Treatment are Dismissed*

Plaintiff's Complaint asserts claims of gender discrimination based upon her termination and "[u]nequal terms and conditions of . . . employment." (Compl. ¶ 4.) To establish a prima facie case of discrimination under Title VII, a plaintiff must show that: (1) he belonged to a protected class, (2) was qualified for the position he held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).[5] Once a plaintiff has

---

[5] The same standards apply to Plaintiff's claims of gender discrimination under the NYSHRL. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

made out a prima facie case, the burden shifts to the defendant to proffer some legitimate, non-discriminatory reason for its actions. *See Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2000). If the defendant proffers such a reason, the burden shifts to the plaintiff to show that the employment decision of which he complains "was more likely than not motivated, in whole or in part, by unlawful reasons." *Id.*

Here, Plaintiff cannot make out a prima facie case of discrimination arising out of her claims of unequal terms of employment because the record is devoid of any evidence that Plaintiff was treated unfairly. To the contrary, Defendant has produced evidence that Plaintiff was paid more than 60% of the men working in the Production Department and that she was the highest paid Estimator at the time of her layoff. Thus, because there is no evidence that Plaintiff was subject to unequal terms of employment, this claim is dismissed.

To the extent Plaintiff claims that she was laid off based on her gender, this claim too must fail. Although the first three elements of Plaintiff's prima facie case are undisputed (that Plaintiff is a female, that she was qualified to be an Estimator, and that she was laid off), there is no evidence suggesting that Plaintiff was laid off under circumstances giving rise to an inference of discriminatory intent. The Complaint alleges that Plaintiff was replaced by a male employee two days after her layoff; however, there is no evidence in the record to support this allegation. Instead, the record undisputably establishes that in April 2000, a male Estimator was laid off, followed by Plaintiff's layoff in September 2000. In 2001, two female Estimators were laid off. By mid-2001, Defendant had only one Estimator in the department, Peter Kremler, who had more seniority than Plaintiff, even when considering Plaintiff's time in the Production Department. Mr. Kremler was later replaced by Karl Riemenschneider who is the only

Estimator employed by Defendant today. To the extent Plaintiff suggests that Mr. Riemenschneider "replac[ed] [her] in [her] duties" (Compl. ¶ 8), there is no support for such contention in the record.

Even assuming that Plaintiff could make out a prima facie case of discrimination, Defendant has set forth legitimate, non-discriminatory reasons for Plaintiff's layoff. The record reveals that prior to Plaintiff's layoff, Defendant was having financial difficulties which caused it to lay off a substantial number of employees, both men and women. In fact, in April 2000, five months before her layoff, Plaintiff expressed concern "as to the stability of the company." (Pl.'s Journal at 3.) Plaintiff's journal also reflects her observation that "many departments [had] substantial layoffs, in some cases of long-term personnel." (*Id.*) Because Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's layoff, and because there is no evidence in the record which would permit a reasonable juror to find that this explanation was "not the only reason[] and that [discrimination] was at least one of the 'motivating' factors," *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 123 (2d Cir. 2004) (quotation marks and citation omitted), Plaintiff's gender discrimination claim is dismissed.

### C. *Plaintiff's Claims of Retaliation are Dismissed*

Plaintiff alleges that Defendant selected her for layoff in retaliation for her alleged complaints of discrimination. "In order to present a prima facie case of retaliation under Title VII . . . , a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find [1] that [ ] he engaged in protected participation or opposition under Title VII . . . , [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse

action, i.e., that a retaliatory motive played a part in the adverse employment action.'" *Kessler v. Westchester Couty Dep't of Soc. Servs.*, 461 F.3d 199, 205-206 (2d Cir. 2006) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)). Once the employee has established a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the employee to demonstrate pretext. *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 94-95 (2d Cir. 2001).[6]

Here, Plaintiff cannot establish a prima facie case because there is no evidence that she engaged in a protected activity or that a causal connection existed between any protected activity and her layoff. Protected activity has been defined as any activity that opposes unlawful employment practices under Title VII. *See* 42 U.S.C. § 2000e-3(a). "[I]n order for an employee's complaints to be a "protected activity" they must relate to an alleged violation of Title VII, i.e., the complaints must relate to race or gender. Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in Title VII even when race or gender was not an issue." *Gourdine v. Cabrini Med. Ctr.*, 307 F. Supp. 2d 587, 598 (S.D.N.Y. 2004), *aff'd in part and vac'd in part and remanded on other grounds*, 128 Fed. Appx. 790 (2d Cir. 2005). *Accord Cruz. v. Coach Stores Inc.*, 202 F.3d 560 (2d Cir. 2000) (protected activity for Title VII retaliation claims "refers to an action taken to protest or oppose statutorily prohibited discrimination").

Here, there is no protected activity on which to base a claim of Title VII retaliation. The record reveals that at best, Plaintiff made generalized complaints of unfair

---

[6] Retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

treatment to several different managers. There is no evidence that she complained of the activity she now alleges forms the basis of her hostile environment and retaliation claims. In fact, when discussing her transfer to the Estimating Department, she did not express to Clark or anyone else that she was requesting a transfer in order to remove herself from an allegedly hostile work environment.

However, even assuming arguendo that some of Plaintiff's complaints could be construed as gender-based, her claim would still fail because there is no evidence of a causal connection between her purported complaints and her layoff. Causation can be established either directly through evidence of retaliatory animus directed at a plaintiff, or indirectly by showing that the protected activity was followed closely by discriminatory treatment. *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Here, Plaintiff's allegations do not do not set forth direct evidence of a retaliatory animus. Thus, the Court will examine whether there is any indirect evidence of causation.

In the Second Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by "showing that the protected activity was closely followed in time by the adverse [employment] action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and quotation marks omitted) (stating that twelve days between alleged sexual harassment and discharge could suggest a causal relationship). Though there is no bright-line rule, an adverse employment action following within a couple months of the protected activity typically suffices to establish causal connection. *See Cioffi v. Averill Park Cent. School Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech

18

and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment.") (collecting cases); *Gormon-Bakos v. Cornell Co-op Extension of Schenectady*, 252 F.3d 545, 555 (2d Cir. 2001) (passage of up to five months short enough for causal connection where plaintiffs provided evidence of retaliatory actions throughout that time period); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight month period between filing of EEOC complaint and retaliating action sufficient to suggest causal relationship).

Plaintiff was transferred to the Estimating Department in September 1999. There is no evidence in the record of her having made any complaints after her transfer. She was laid off on September 12, 2000. Here, the passage of over one year between the time of Plaintiff's last complaint and her September 2000 layoff is too long to raise a question of fact on causation. *See Chang v. Safe Horizons*, No. 05-6760-CV, 2007 WL 3254414 (2d Cir. Nov. 5, 2007), at *1 (summary order) (affirming lower court's grant of summary judgment in defendant's favor where plaintiff's termination "occurred almost one year after her complaint of discrimination, thus undermining any causal nexus based on temporal proximity); *Butler v. Raytel Med. Corp.*, 150 Fed. Appx. 44, 2005 WL 2365340, at *2 (2d Cir. Sept. 27, 2005) (summary order) (finding one year to be too long to raise issue of fact on temporal proximity); *Ludwiczak v. Hitachi Cap. Am. Corp.*, 528 F. Supp. 2d. 48, 60 (D. Conn. 2007) ("In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship."). Accordingly, the Court finds that Plaintiff's retaliation claims must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. Upon entry of judgment, the Clerk shall close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.
August 20, 2008

/s
Denis R. Hurley,
United States District Judge